

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00367-CV

———————————————

IN THE INTEREST OF H.S., B.S., AND M.S., CHILDREN

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-22-0621

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

K.S. (Mother) and C.S. (Father) separately appeal from the trial court's order terminating their parental rights to their three children—H.S. (Henry), B.S. (Beth), and M.S. (Mary)—and appointing the Department of Family and Protective Services as the children's permanent managing conservator.[1] In this ultra-accelerated appeal,[2] Mother raises ten points, and Father raises eight points. We will affirm.

## I. Events Leading to the Children's Removal From the Home and to the Parental-Rights-Termination Trial

Mother and Father started dating when she was 16 years old. He was 24. In May 2014, when Mother was 18 years old, she gave birth to Henry. Mother and Father got married that July. Beth was born in December 2016, and Mary was born in September 2019.

## A. The Department's involvement, investigation, and removal

During an argument in May 2022, Father picked Mother up by her throat and slammed her down on top of his toolbox. He then hit the back of his head with a

---

[1]We refer to the children using aliases and to other family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

hammer and slammed his head into a wall. The children were in the house at the time,[3] and Henry witnessed the incident.

This was not the first time Father had engaged in self-harm or attempted suicide while the children were in the home:

- Several years earlier, Father drove his vehicle toward a mobile home as if he were going to drive into it, but he stopped short before hitting it. Father was upset because Mother had witnessed Father's then-12-year-old son, who was living with them at the time, inappropriately touching other children, and she had reported the incident to law enforcement.[4] The children were in the house at the time of Father's actions.[5]

- When Mary was nine months old, Mother told Father during an argument that she wanted a divorce. Father responded by grabbing a gun and threatening to shoot himself. The children were in the house at the time. Mother wrestled the gun away from Father because she was afraid the gun would go off and one of the children would be hit.

- During another argument, Father pulled a knife and threatened to stab himself while the children were in the home.

- Father threatened to hang himself after another argument. He put a rope around his neck while the couple was in their bedroom. Mother had to remove the noose. The children were at home at the time but were not in the bedroom.

- Father slammed his head on a countertop. The children were in the house playing at the time.

---

[3]The family lived in a single-wide mobile home.

[4]At trial, Father denied that he was trying to run the car into the mobile home. He characterized the event as his vehicle spinning out toward the structure.

[5]It is unclear from the trial testimony whether the mobile home Father was driving toward was the family's home or another mobile home, although the jury could have inferred the former from Mother's testimony.

- Mother and Father got into an argument while they were working on the backside of their home's exterior. Father threatened to shoot himself with a nail gun. The children were playing in the front yard at the time.

Mother claimed that she had left Father after each incident. After the May 2022 incident, Mother left again and took the children to her mother's house. Mother's best friend later took Mother to file a police report. An application for a protective order against Father was filed,[6] and a warrant was issued for Father's arrest.

Because of Father's assaulting Mother, the Department opened a case and assigned it to Stephen Seyfried, an investigator with the Department. Seyfried contacted Mother, who had taken the children to Missouri to stay with her father, to make sure that she was okay. Mother told Seyfried that she was afraid of Father because his "violence against her had increased and had reached a new level and [that] she was very fearful for her safety and the safety of her children." She also told Seyfried that Father's behavior had become more erratic and that he had threatened to commit suicide in front of the children. She was worried that "he could take a turn

---

[6]In addition to detailing the May 2022 assault, the protective-order application contained allegations about Father's past behavior: in July 2021, Father had threatened to kill anyone who took Mother away from him, and in April 2022, Father had "talked about going on a mass[-]murder spree." The application further stated that all three children were present during these events and listed the weapons that were involved: a shovel, knives, ropes, a hammer, and a frying pan. The protective-order application was electronically signed by Mother, but at trial, she denied having applied for a protective order. She speculated that her best friend, who does not like Father, filed the application.

and take his violence out against the kids." At that time, Mother was not sure whether she and the children would stay in Missouri or return to Texas.

A few weeks later, however, Mother and the children returned to Texas. In July 2022, Seyfried met with them several times in their home. Mother again indicated that she was afraid of Father. She recounted that she became involved in a relationship with Father when she was 16 years old, and he was 24. She told Seyfried that she felt that Father had been grooming her. She also accused Father of isolating her by not allowing her to work outside the home and by having her homeschool the children so that she would not be able to get a job. She believed that this was Father's way of limiting her ability to be independent from him. Mother also told Seyfried that Father's interest in pornography had caused problems in their marriage. She said that Father had touched her "sexually and inappropriately in front of the children" and that he had ignored her requests to stop.

Mother also told Seyfried about the several instances in which Father had engaged in self-harm and had attempted suicide. Mother said that the children had been present for some of them. According to Mother, Father lacked behavioral limits, and the fact that the children were present would not stop Father "from doing what he's going to do."

Henry told Seyfried that he had witnessed the May 2022 incident and said that he was scared by what he saw. Beth told Seyfried that "her daddy had grabbed her mama by the neck and [had] thrown her on the ground." Beth also felt scared.

5

Unprompted, Beth "pointed to [a] dresser that was against the wall, and she said that's the dresser that my daddy smashed his head on and there was blood everywhere."

Mother denied having any contact with Father since the May 2022 incident other than when he made a surprise visit to the home on Father's Day that year. Mother briefly expressed a desire to drop the charges against Father and to reunify with him. Seyfried responded by letting Mother know that allowing Father back in the home would endanger the children and that the Department could remove the children from the home for their safety. Mother said that she understood. According to Seyfried, Mother insisted that she and Father were not getting back together and that she wanted to divorce him. Mother told Seyfried that based on her and Father's relationship and where it was going, she believed that if she stayed with him, he would eventually kill her.[7]

At that time, Mother "definitely wanted help" becoming independent from Father. She had no job, vehicle, or childcare. She told Seyfried that she was already getting help from her church. Seyfried provided her with a Parker County resource guide and pointed her to specific places that she could have access to resources. Although Mother recognized that she needed to be independent from Father and

---

[7]Although Seyfried repeatedly attempted to contact Father to get his perspective on what had happened, he could not contact Father at various telephone numbers. Seyfried even referred the case to a special investigator, but the investigator was also unable to track down Father.

wanted to separate from him, she wanted couples counseling so that she and Father could learn to coparent the children.

Mother was adamant that she would not allow Father back into the home. Based on these assurances, Seyfried did not seek to remove the children from the home, and he thus closed his investigation.

Because the Department believed that Father was a danger to the children but wanted him to be able to come back home and eventually reunite with the family, the case was referred to the Department's Family-Based Safety Services (FBSS) in July 2022.[8] FBSS specialist Alyssa Bottlinger first met with Mother and the children in their home in late August 2022 to conduct a family-strengths-and-needs assessment to help identify what services the family needed.[9] The initial meeting went well. Mother was cooperative and told Bottlinger that she was concerned about how the domestic violence was affecting the children and that she wanted counseling for herself and the children. Mother also mentioned that Henry was being bullied at school but that she had not addressed the issue with the school because she was still deciding how to handle the situation.

Bottlinger returned two weeks later with safety and family-service plans for Mother to review and sign. The safety plan required Father's contact with the children

[8]FBSS's goals are family reunification and preservation of the family unit.

[9]Despite her best efforts and using special investigators, Bottlinger was never able to locate or speak to Father.

to be supervised by someone other than Mother. Bottlinger advised Mother that if the safety plan was violated, the children could be removed. Mother said that she understood and signed the safety plan. Bottlinger then presented Mother with the family-service plan, which laid out counseling services, parenting classes, and domestic-violence classes. The plan also noted the school-bullying issue and stated that Mother had not addressed the situation with the school. Mother became upset because, unbeknownst to Bottlinger, Mother had addressed the bullying issue with the school sometime after Bottlinger's first visit. Mother then accused Bottlinger of falsifying the family-service plan. Bottlinger assured Mother that she would correct the plan, but Mother was not satisfied and asked Bottlinger to leave. Bottlinger scheduled another visit with Mother and the children, but a few days before the visit, Mother called Bottlinger and told her that she would need a warrant or court order to come on the property or to see Mother and the children.

Bottlinger then asked law enforcement to perform a welfare check on Mother and the children. On September 28, 2022, the law-enforcement officer conducting the welfare check discovered that Father was back in the home with the children in violation of the safety plan. The Department thus decided to remove the children.

On September 29, 2022, the Department sued for conservatorship of the children and to terminate Mother's and Father's parental rights to them. That same day, the trial court signed an order appointing the Department as the children's

temporary conservator and appointing each parent a temporary attorney. The children were removed from the parents on October 3, 2022, and placed into foster care.

The day the children were removed, Father was arrested for the May 2022 assault. He was charged with misdemeanor assault and was released on bond. That charge remained pending throughout the case and at the time of trial.

## B. The parents' service plans

After the children's removal, Monica Villegas, a permanency specialist (i.e., caseworker) with Our Community Our Kids (OCOK),[10] was assigned to the case. Villegas met with both parents at the beginning of the case to review their respective service plans with them. These service plans included maintaining housing and transportation; demonstrating the ability to care for themselves and the children; attending scheduled visitation with the children; developing a support system; submitting to random drug testing; accepting responsibility for the reasons for removal; and attending and participating in various assessments, counseling sessions, and classes to address issues such as substance abuse, anger management, mental health, domestic violence, and parenting skills.

---

[10]OCOK is a private provider of community-based care that contracts with the Department to provide "foster care case management, kinship, and family reunification services" in parts of the state, including Parker County. *See* Tex. Dep't of Family & Protective Servs., https://content.govdelivery.com/accounts/TXDFPS/bulletins/27e68be (last visited Mar. 11, 2024); *see also* Tex. Fam. Code Ann. §§ 264.151–.172 (describing and providing requirements for Department oversight of private community-based-care system for the State of Texas).

Although Mother and Father understood that completing services was necessary for the children's return, both largely resisted doing their services, even though Villegas and the children's Court Appointed Special Advocate (CASA) repeatedly encouraged them to do so. The parents completed the required parenting classes relatively quickly. But with most of their services, the parents delayed completing necessary paperwork or were discharged from service providers for not being truthful, for disruptive behavior, and for nonattendance. In some instances, Villegas had to beg the providers to take the parents back. The parents did not start actively engaging in most of their services until about four months before the September 2023 termination trial started.

The parents gave several reasons for their delay. Mother explained that she first needed to "warm[] up" to the providers. Father initially believed that the service plans were set up for the parents to fail. He explained that he had tried participating in services at the case's beginning but that he had trouble with the providers because they were rude and disrespectful to him. He also claimed that he did not understand his service plan and that he let his stress and anxiety take over. He further explained that he had delayed starting to work services because "[i]t takes people time."

The parents also attributed their delay to not having attorneys for several months. The trial court had discharged their appointed attorneys on November 15, 2022, because the parents had failed to complete the paperwork required to establish their indigency and the corresponding right to appointed counsel. The trial court,

Villegas, and the CASA repeatedly encouraged the parents to complete the paperwork for appointed counsel, but the parents resisted because they thought that attorneys would not be helpful and that they could defend themselves. Eventually, the parents completed the paperwork, and the trial court reappointed their attorneys in early March 2023.

## C. The parents' visits with the children

Until March 2023, the parents attended nearly all scheduled visitations with the children. The visits, all of which were supervised, did not always go well:

- A visit had to be ended early because Mother continued to ask the children inappropriate questions even though she had been redirected and asked to stop.

- Mother got into a verbal altercation with Beth and Mary's foster mother, attacked the foster mother's parenting abilities, and accused the foster mother of sexualizing the girls. Villegas had to intervene to end the conversation.

- Henry grabbed a table and swung it over his head as if he were going to hit the CASA. The parents did not acknowledge Henry's behavior or attempt to redirect him. A visit supervisor had to stop him.

- Henry repeatedly tossed a full water bottle up in the air, and it eventually hit the floor and broke. The parents did not attempt to stop Henry from throwing the water bottle or ask him to clean up the water.

- The parents gave Henry a haircut. When Villegas asked Mother to clean up the hair, Mother—in front of the children—laughed and told Villegas, "This is not my home[,] and it's your job because it's your facility."[11]

---

[11]Mother and Father both claimed that Father vacuumed up the hair, but Villegas said that she did.

11

- At the parents' February 21, 2023 visit, Henry became upset because he wanted to go home with his parents. After Father comforted him for a few minutes, Mother asked Villegas and the CASA if they enjoyed seeing Henry upset. They replied "no" and explained that they felt that it was less traumatizing to let Father comfort Henry rather than pulling Henry away. Mother and Father then told Henry that it was the Department's fault that he could not come home with them. Henry became even more upset and clung to his parents. The parents barricaded Henry between them, refused to let Henry go, and continued blaming the Department for the situation. Villegas and the CASA unsuccessfully tried to calm down the parents and Henry and to deescalate the situation. After about 45 minutes, law enforcement was called. Mother told them that she was not going to let Henry go and that they would have to "yank" him away from her. It took another 45 minutes to an hour for the parents to let go of Henry and to end the visit.

On more than one occasion, the children's foster parents reported that after visiting with the parents, the children had behavioral issues.

Shortly after the February 21 visit, the children's attorney ad litem moved to suspend the visits entirely. At that motion's hearing, Villegas reported on the parents' continued resistance to working their service plans. She did not oppose suspending the parents' visitation, and the CASA supported the attorney ad litem's request to suspend the visits. On March 2, 2023, the trial court signed an order granting the motion and suspended the parents' access to the children. The trial court's order provided that once the parents had engaged in their service plans, demonstrated a willingness to follow visitation rules, and completed court-ordered drug testing,[12] their visitation would resume.

---

[12]The parents had frequently refused to drug test.

In April 2023 and August 2023, the parents moved to reinstate their visitation rights. After evidentiary hearings on those motions, the trial court denied them.

**D. Mother's motion to extend the one-year dismissal deadline**

With the September 11, 2023 trial date and the October 2, 2023 statutory-dismissal date approaching, Mother moved the trial court in August 2023 to retain jurisdiction over the case and to set a new dismissal date. *See* Tex. Fam. Code Ann. § 263.401(a), (b). Mother argued that the trial court should extend the dismissal date to April 27, 2024, to give her more time to complete her service plan. After a hearing at which Mother and Emily Hindman, the children's counselor, testified, the trial court denied the motion. The case proceeded to trial as scheduled.

## II. The Trial

During the five-day jury trial, the jury heard testimony from Mother, Father, Seyfried, Bottlinger, Villegas, Hindman, the CASA, three of the parents' counselors, Father's bond supervisor, one of the parents' neighbors, and four members of the parents' church.

**A. The removal and the parents' assurances**

Seyfried and Bottlinger recounted the events set out above surrounding their involvement with the family and explained the Department's concerns for the children's safety and its reasons for removing the children from the home. During the parents' testimony, they admitted that the children were in the home when the self-harm and domestic violence events occurred. They agreed that Father's self-harm and

the domestic violence had created an environment that endangered the children's physical and emotional well-being and that the conduct itself had endangered the children's physical and emotional well-being.

Mother claimed that the only time Father was physically violent with her was in May 2022. She insisted that she was not afraid of Father and had never been afraid of him, even during the May 2022 incident. She denied ever telling anyone that she feared Father or that she was worried that Father would turn on the children. Mother explained that each time Father had engaged in self-harm, she had taken the children and left. But each time, she and Father later reunited. The only time that she sought help for Father was when she called law enforcement after he threatened to hang himself. This resulted in Father's being hospitalized for 24 hours.[13] Mother did not seek help for herself or the children until she filed the police report after the May 2022 incident. After that incident, Father did not seek treatment, and according to Mother, she and Father separated for five months. Mother explained that she let Father come back because he had "show[n] progression," and she "believe[d] that he was working on himself." The parents reconciled because Mother had seen "change within him, and his demeanor, so [she] felt it would be okay."

One of the parents' neighbors, however, painted a different picture. Crystal Murillo, who had been a neighbor for two-and-a-half years, testified that Mother had

---

[13]Both Mother and Father claimed that hospital staff did not refer him to mental-health treatment or prescribe him any medication.

told her several times that she was afraid of Father. In fact, when Father left the family after the May 2022 incident, Mother had asked Murillo and her husband if she could borrow a weapon because she was afraid of Father; they loaned her one. According to Murillo, Father returned to the home less than two weeks—not five months—after the May 2022 incident. When Father returned, Murillo and her husband got the weapon back because they feared that Father would use it on Mother.

Mother and Father separated twice during the case's pendency because, according to Mother, the couple "just couldn't get on the same page." The last time they separated, which was in February or March 2023, Mother asked law enforcement to do a welfare check on Father because she was concerned that he was going to drive off a bridge. Mother explained that Father had a pattern of attempting self-harm if they were separated or if she threatened to leave him. But despite this pattern, Mother insisted that she would leave Father for good if he hurt her or himself again. She was unwilling, however, to consider divorcing Father because she considered divorce and witnessing physical violence in the home to be equally traumatic to children.

Mother testified that given what she had learned, she would not allow Father to be around the children if he was displaying violent behavior. She was willing to give Father another chance because since he had started working services and the parents had joined their church, Father had the knowledge, skills, and support to deal with his issues. Mother said that Father had learned how to better control his anger when

15

dealing with confrontation.[14] Before the children's removal, the parents had no support, but Mother believed that their church support combined with the services Father was receiving from the Department would enable him to address his emotional, mental, and psychiatric problems. Mother was confident that Father could handle his issues and not emotionally endanger the children. Both parents were willing to continue any treatment, counseling, and therapy that they and the children needed.

Father testified that his most recent incident of self-harm was in February 2022 when he banged his head against a wall while arguing with Mother. But he promised that there was no risk that he would self-harm again because of the support he has through his church and the help he had received through the various counseling services he had been participating in as part of his service plan. Father agreed that his behavior had been going on for several years, but he claimed that the roughly three months of counseling and treatment that he had recently received sufficed to address his issues. The couple understood that the Department was trying to help them, and they were willing to do whatever it took to get the children back.

## B. The parents' service plans

Despite the parents' expressed willingness at trial, they had not shown that initiative throughout the case. As noted, despite Villegas's and the CASA's

---

[14]Murillo testified that there had been incidents of domestic violence between Mother and Father since the children had been removed. "[E]very other day," Murillo hears Mother and Father screaming and yelling at each other inside their home.

encouragement, the parents resisted participating in their service plans at the case's start, and several providers had thus discharged them. As a result, they struggled to complete their plans.

At the time of trial, neither parent had successfully completed the required psychological assessment. And although they had both completed their required psychosocial assessments, they had only recently done so, Mother in July 2023, and Father in August 2023. These assessments were required before the parents could participate in individual counseling, and because of the parents' delay, neither parent had yet started individual counseling.[15]

But Mother and Father had completed some of their service-plan requirements and were still in the process of completing others. As noted, Mother and Father had completed their parenting classes, and they had completed couples counseling. Mother had very recently completed an anger-management class and a Victim's Intervention and Prevention Program (VIPP). The jury heard from Villegas and three of the parents' counselors regarding the parents' progress on their plans.

Both parents had been ordered to complete anger-management classes as part of their service plans. Mother completed a 12-week anger-management class less than

---

[15]Mother testified that she had started individual counseling two months before trial. Villegas, however, testified that she had verified with Mother's providers the week before trial that Mother had not started individual counseling. Villegas believed that Mother claimed that she had started counseling because she had done the psychosocial assessment.

two weeks before the trial started. At the time of trial, Father had completed only four of the 12 required anger-management sessions. Mother's plan also required her to participate in a VIPP, and Father's plan required him to participate in a Batterer's Intervention and Prevention Program (BIPP). Both parents took these classes through CW Outreach. Father's anger-management course was also through CW Outreach.

Mother started VIPP with CW Outreach in late 2022. According to Chris Wernert, a counselor and CW Outreach's owner, Mother was initially angry and denied that she was a domestic-abuse victim. She was argumentative, made excuses for Father's behavior, and minimized what had happened to her. She was disruptive during sessions and did not constructively participate. As a result, she was unsuccessfully discharged from the program in March 2023.

At that time, Wernert thought that Mother had been groomed and brainwashed and needed an extensive mental-health evaluation. But when Wernert talked to Mother about getting mental-health treatment, she rejected the idea. Mother also told Wernert that she did not believe that domestic violence affects children. He did not think Mother could protect the children from herself or Father. Wernert was concerned that this case "could be a murder-suicide" with Father killing Mother and then himself.

At some point, Mother returned to counseling at CW Outreach. In June 2023, Mother started to make positive changes. According to Wernert, she started

participating in the program and finally admitted that she was a family-violence victim. She had learned coping skills, and she had accepted responsibility for the children's removal and understood that its cause was the home's toxic environment. She now understood domestic violence's negative effects on children and saw domestic violence as a form of child abuse.

Mother completed VIPP about two weeks before trial. Wernert testified that he believed that Mother would protect the children from Father because she had told Wernert numerous times that if she had to, she would choose the children over Father and would leave him to protect them. But when asked what actions Mother had taken that would indicate that she would choose the children over Father, Wernert responded, "She hasn't been put in that position yet to make a choice." The attorney ad litem then pressed him further:

Q. What do you mean by that?

A. She's trying to work it out with her husband, and then, you know, she wants to know what the [Department] wants to do -- that y'all make a choice and she'll choose her children.

Q. So I guess I don't understand what you're saying. I'm sorry.

A. All right. I guess she was waiting to see what y'all wanted -- do y'all want them to split up? Do you want them to stay together?

If she had a choice of either, A, getting the kids back or, B, staying with [Father] and not getting the kids back, she would leave.

Q. Okay. At this point in time, she's not made any affirmative actions to separate from [Father]?

A. No.

Wernert testified that he had first worked with Father in late 2022. Like Mother, Father was initially angry and resisted treatment. During that time, Father had worked with some female counselors at CW Outreach, but he indicated that he did not want to work with a female counselor. Father was eventually dismissed from treatment at CW Outreach.

Like Mother, Father later resumed treatment there. But as late as June 2023, Father appeared to be "just checking off boxes" and would tell Wernert what Wernert wanted to hear; there was "no sincerity" in what Father said during treatment. But Father had a "change of heart" in June or July 2023. His attitude and actions changed, and he started to take accountability for his actions. He was no longer argumentative, had opened up to Wernert, and had shown remorse. Father started anger-management classes five weeks before trial and BIPP one week before trial.[16]

According to Wernert, Father had realized that he needed to work on his anger, and he was making progress. But Father had not yet gotten far enough into treatment to accept responsibility for the reasons for the children's removal. It was also too soon for Wernert to say whether Father was a continued domestic-violence risk. When asked whether Father had an untreated mental-health issue, Wernert responded, "I would think so, probably, yeah."

---

[16]According to Father, he was taking a second BIPP through CW Outreach. He testified that he was also doing BIPP with another provider, and at the time of trial, he had taken eight BIPP classes with that provider and had four classes left.

While Wernert had seen progress with both parents, he would not recommend returning the children to Mother if Father was still in the home. He believed that Mother would protect the children, but he believed that it was necessary for her to separate from Father.[17] With Father in the home, it was not safe for the children to return.[18] But Wernert believed that Mother could get the children away from Father quickly "should an incident occur."

Kent Bass is a family counselor who did a family assessment with Mother, Father, and the children in February 2023 to get the family's history and to develop a treatment plan. During the assessment, the parents and the children were very loving and affectionate with each other, and the children were not scared of the parents. After the assessment, Bass determined that the parents needed to undergo couples counseling before engaging in family counseling.

Mother and Father began couples counseling with Bass in mid-March 2023. At the time of trial, Mother and Father had completed 18 counseling sessions with him. The parents' counseling goals were to process, address, and cope with the domestic violence that was going on between them; to learn and apply communication skills; and to learn and apply positive coping skills. Bass felt that both parents had worked

---

[17]Murillo testified that she and her husband have tried to help Mother leave Father to no avail.

[18]Murillo was similarly concerned—she feared that if the children were returned to the parents while Father was still in the home, the "children won't be alive."

through their issues and met their goals, except that Bass had not addressed Father's mental-health issues regarding suicide. Even so, Bass concluded that the parents had successfully completed couples counseling. The only reason that he had not discharged them from counseling was so that he could continue offering them support.

Bass opined that the parents were ready for family counseling with the children and stated that he had recommended family counseling to Villegas in July or August 2023. Bass admitted that he should have—but did not—consult with the children's therapist before recommending family counseling.

He was aware that the parents' visitation with the children had been suspended.[19] The parents had reported to him that Villegas had suspended the visits because one of the children had gotten very loud and upset during a February 2023 visit. Bass said that the parents took no responsibility for what had happened at the visit and did not tell him that their behavior had exacerbated the situation. Bass was also unaware that it took law enforcement 45 minutes to deescalate the situation and end the visitation and that the trial court—not Villegas or OCOK—had suspended visitation. Bass additionally did not know that the trial court had twice denied the parents' requests to resume visitation with the children. These denials,

---

[19]By the time Bass testified, the jury had heard detailed testimony about the parents' visits—including the February 2023 visit—with the children and about the trial court's suspending those visits.

22

however, did not change Bass's opinion that it was a good idea for the parents to resume visits with their children.

As with the reasons why the parents' visitations were suspended, Bass was also not aware of all of Father's self-harm incidents and suicide attempts. He was surprised to learn that in February 2023, Mother had called for a welfare check on Father because she was afraid that he might hurt himself. Bass admitted that people in therapy sometimes leave out important details to make themselves look better, but he did not believe that the parents had done so.

The parents' plans also required that they submit to random drug testing at the Department's request. Although failing or refusing to test would result in a presumed positive test, both parents refused to test when asked several times during the case. Mother admitted that from November 2022 through February 2023, she had refused five test requests from the Department. Father also refused to test multiple times when asked, most recently the month before trial.

Mother and Father tested for the first time in early March 2023; they both tested positive for marijuana. Villegas testified that out of Mother's eight tests, five were positive. In early April, Mother tested positive for amphetamines, methamphetamines, opiates, heroin, morphine, and norhydrocodone,[20] and in May,

---

[20]Although Mother admitted to recent marijuana and alcohol use, she denied using any other illegal drugs or controlled substances since she was a teenager. She claimed that the lab falsified the April 2023 test results.

she tested positive for marijuana. Mother's first negative test was in June, and she tested negative again in August and September. Father also tested negative in September. But other than that test and the March 2023 test, Father refused at least five other testing requests from the Department in April, May, June, July, and August 2023.

Mother and Father admitted that they had refused to test because they were using marijuana. They both testified that they had continued to use marijuana during the case but claimed that they had last used it in April 2023. Father admitted that using marijuana violated his bond conditions[21] and that a bond-condition violation could result in his bond's being revoked and his going to jail. For these reasons, he had refused to test when the Department asked. He also refused to test because he was testing through Parker County's community-supervision department, and he demanded that the Department get those results from his bond supervisor.[22]

---

[21]Hunter Reynolds, Father's bond-condition supervisor, testified that although a trial court had set Father's bond conditions in early October 2022, it did not appear that those bond conditions were supervised until Reynolds became Father's bond supervisor in April 2023. The October 2022 bond conditions, as well as the conditions imposed on Father while under Reynolds's supervision, required Father to abstain from illegal drugs and alcohol. While under Reynolds's supervision, Father submitted to random drug testing about once a month starting in April 2023, and Father had never tested positive on those tests.

[22]Villegas testified that the Department did not have access to those records. According to Reynolds, however, he could share Father's drug-test results with the Department upon request, and he thought, but was unsure, that he might have shared Father's results with a Department caseworker.

24

According to Mother, Father saw no reason to test at the Department's request because he was testing through the community-supervision department.

Although the parents' service plans also required them to complete a substance-abuse assessment and to follow all recommendations from that assessment, the parents delayed the assessment until early March 2023. Patty Merrill, the parents' substance-abuse counselor, testified that Mother's assessment revealed that Mother was currently using marijuana to cope with anxiety and that she had a history of using alcohol, marijuana, and methamphetamines. Mother reported to Merrill that she had last consumed alcohol six months before her assessment, had last used methamphetamines when she was 15 years old, and had last used marijuana on March 2, 2023, the day before her assessment. Father's reported history was inconsistent and vague. He resisted giving any information to Merrill during the assessment but did tell her that he had a history of substance abuse. He did not reveal any details to Merrill but reported that he was currently using marijuana for Crohn's disease.[23]

Merrill testified that she has been providing substance-abuse counseling to both parents since March 2023, but Mother's participation did not become consistent until May 2023. Since then, Mother had opened up a lot, was making a good-faith effort to participate in counseling, and had made significant progress, but she still "ha[d] a long way to go in dealing with some of her issues."

---

[23]There was no other mention of Father's having Crohn's disease.

According to Merrill, Mother and Father have an enmeshed relationship and resisted having individual counseling sessions. In the six to eight individual counseling sessions that Mother did have with Merrill, she was calmer and "more open to talk about herself." But when Father was present, Mother was more concerned about him and his needs. Father refused to do individual counseling with Merrill despite her expressing the importance of individual sessions to his recovery. He told Merrill that he was not comfortable unless his wife was there with him.

Because of the parents' enmeshed relationship, Merrill recommended early on that they separate to work on becoming independent from each other before working on their relationship. The parents declined to separate. Even so, Mother had become more independent from Father, and Merrill believed that if Mother were "in a situation with her children and [Father] was doing something harmful," she would leave. Merrill testified that Mother had accepted her mistakes with the children, had set "boundaries where the children [were] concerned," and had told Father in recent sessions that if his behavior continued, she would take the children and leave him. But despite Mother's progress, Merrill said that Mother is "still a work in progress" and was not as independent as Merrill would like her to be. Merrill had thus not discharged her from treatment.

Merrill described Father as initially "completely closed" and resistant to counseling. But after Merrill and Father had a serious conversation in July 2023, Father had started to "open up" and had made some progress. But he still had a long

way to go. Merrill testified that Father still had issues with taking accountability for his actions and was still blaming others—specifically the Department, OCOK, and Mother—for his problems. Merrill also questioned whether Father was making a good-faith effort in counseling because she did not see him utilizing what he was learning.

Merrill testified that Father is guarded and has a deep, ingrained mistrust of others, especially women. She theorized that this mistrust is the result of emotional trauma or mental-health issues. She had recommended that Father get inpatient mental-health treatment and anger-management counseling. Father was very resistant to inpatient treatment but had indicated to Merrill that he was willing to do some additional treatment and counseling. She thought that Father's mental health needed to be treated first and estimated that Father needed well over a year (or longer) of counseling to recover. Father's level of resistance to counseling caused Merrill concern for both parents' continued recovery.

The Department was also concerned about the parents' mental health and had required both to undergo psychiatric evaluations. Mother completed her evaluation in March 2023. According to Villegas, after this evaluation, Mother was asked to go to inpatient psychiatric treatment but had refused because "she had heard bad things about it[,] and [Father] did not speak highly of it." Mother denied that inpatient care had been recommended. Father did not complete his evaluation until August

27

2023 and had an appointment with a psychiatrist the month after trial. Father was also asked to complete a suicide assessment, but he never did so.

Both parents admitted to struggling with mental health. Father admitted that he suffers from depression and anxiety. Mother testified that she had been diagnosed with depression, post-traumatic stress disorder, and anxiety.[24] Mother had been prescribed medication to help with these conditions, but she had refused to take it because she is opposed to taking psychotropic medication. Father was also opposed to taking psychotropic medication.[25]

In addition to submitting to drug testing and participating in the various assessments, counseling sessions, and classes, the parents were required to maintain safe and stable housing; demonstrate their financial stability to provide for the basic needs of themselves and the children; and maintain a valid driver's license, insurance, and stable transportation.

The Department took no issue with the condition of Mother and Father's home. Mother and Father own their mobile home, and their monthly lot rent is $500. The month before trial, the parents were $1,800 behind in lot rent and had received

---

[24]Mother had a traumatic childhood that included abuse, rape, and molestation.

[25]Mother admitted to having used marijuana to self-medicate and agreed that she was willing to take an illegal substance but not a prescribed medication. Father explained that he did not want to use psychotropic medications because they were "mind-alter[ing]" and "chemically made." But he had used marijuana, which he admitted is a mind-altering drug.

an eviction notice from the lot owner. At one point, CW Outreach had paid $600 toward the couple's rent. At the time of trial, however, the parents still owed $1,400. Mother testified that the family was not in danger of losing housing because they had worked out a payment plan with the lot owner. Father also denied that their housing was in jeopardy.

Mother and Father own a car that was registered and insured, and each parent had a driver's license.

Mother and Father have had some financial problems since the children's removal but insisted that those problems were caused by their wages' being garnished for child support for the children and by their inability to work full time because they had to work their service plans. Mother, who was a stay-at-home mother before the children's removal, had four employers during the case's pendency. She had been with her most recent employer since June 2023. When the case started, Father had worked for the same company for 14 or 15 years. He left that company in December 2022 and did "odd jobs" for a while. By trial, however, he had obtained a full-time job that paid $20 per hour. Mother and Father anticipated that Father would be able to work full time after he finished his services and would thus be able to provide for the family.

Finally, the parents' service plans required that the parents develop a support system. Mother and Father started attending Sunset Church around Mother's Day in May 2023 and have attended regularly since then. The jury heard testimony from the

church's pastor, a church deacon, the church's owner, and one of Mother's church mentors (collectively, the church family). According to the church family, Mother and Father have become very involved in the church, have engaged in counseling at the church, and have developed a strong support system there. Both parents have church mentors[26] who live nearby and are available to help the couple day or night. Mother's mentor testified that Mother had told her that she would leave Father to get the children back.

Father and Mother had discussed with the church family the issues that led to the children's removal. According to the church family, Father had changed since he and Mother started attending church. At first, Father was lost, broken, and angry; he was in denial and was unwilling to cooperate with the Department. But after having some serious conversations with his church family, Father had changed.[27] In the past few months, Father had become more relaxed and had opened up; had admitted to engaging in self-harm and domestic violence; had accepted responsibility for his actions; had realized that he risked losing Mother and the children; and had started completing his services. Father had become happy, joyful, and active in the church. The church family believed that Father's efforts were sincere, and they had no doubt

---

[26]The pastor and the church deacon are Father's mentors. The pastor's wife—who did not testify at trial—is Mother's other mentor.

[27]Father testified that his church mentors encouraged him to actively participate and engage in his service plan.

that Father loved Mother and loved the children. Based on their observations of both parents, the church family believed that the children would not be in danger if returned to Mother and Father.

## C. The children

At the time of trial, Henry was nine years old, Beth was three months shy of turning seven, and Mary had just celebrated her fourth birthday. All three children suffer from behavioral problems. They are physically and verbally aggressive with each other, other children, and adults, and their behavior is sometimes violent. Villegas and Hindman believed that the children's behavior was primarily caused by their exposure to domestic violence and suicide attempts in the parents' home, not from the trauma of their removal from the parents.

Initially, Mary and Beth were in one foster home, and Henry was in another. Henry was very fond of his foster mother and became very attached to her. In January 2023, all three children were placed in the same foster home. When the CASA visited the children[28] after their February 2023 visit with the parents, she observed that Henry's demeanor had changed; he was sad and upset and was traumatized from that visit. Henry told Hindman and the CASA that he blamed himself for the parents'

---

[28]Since October 2022, the CASA had visited the children monthly in their foster homes.

visitation being suspended.[29] He also disclosed to Hindman that "he felt like if he could go home, he could save and protect his parents" and that he was worried that he would lose Father to a breakup or suicide.

Henry was returned to his original foster home in March 2023 because while all three children were in the same home, their behavioral problems had intensified and because Henry wanted to return to his first foster mother. While in foster care, Henry received trauma-based individual therapy and behavioral therapy. During one of Villegas's visits, Henry became so afraid after seeing his foster mother use a knife in the kitchen to cut food that he hid under a table. It took Villegas ten to fifteen minutes to coax Henry out from under the table. According to Villegas, this was not a normal response for a child.

Although Henry was very bonded with his foster mother, he was no longer in her home at the time of trial. He was in a psychiatric hospital because he had been hitting, punching, spitting, and kicking his foster mother.[30] The CASA believed that

---

[29]Hindman testified that she was in favor of suspending the parents' visitation. Villegas testified that she felt that the children had improved since the visits had been suspended.

[30]Villegas testified that Henry had engaged in this behavior multiple times. Mother said that she was concerned that Henry had been hospitalized because she "just [didn't] see the behavior coming from him to have to reach that point." Murillo, however, testified that Henry had prior incidents of violent behavior, including stabbing a classmate in the face at school, which resulted in Henry's suspension.

because of Henry's aggression toward his foster mother, hospitalization was good for him.

Henry had been prescribed Clonidine, and he was discharged from the hospital during the trial. Upon his release, he was going to a residential treatment center (RTC). In Villegas's opinion, it was in Henry's best interest to go to an RTC, which is a therapeutic setting that helps with behavioral or escalated needs. Villegas opined that if Henry went back to his home or to a foster home, he would not receive the treatment he needs to heal and that he was in danger of harming himself or others if he went anywhere other than an RTC.

Beth and Mary also had behavioral issues. Hindman—who has regular counseling sessions with the girls[31]—testified that both girls are verbally and physically aggressive with children and adults: yelling, hitting, pushing, and slapping. The intensity of their behavior, both in terms of degree and length, is atypical for children their age. The girls are not remorseful after displaying aggressive behavior, and they are unable to internalize and understand how their behavior affects others and the consequences of that behavior. Although Mary is too young to fully understand the concept of empathy, she does not grasp the concept to the degree that she should for her age. Hindman described Beth as "calculated" and testified that "when you ask her

---

[31]Hindman saw the girls at least every other week. She had been their counselor since October 2022. She was also Henry's counselor while all three children lived in the same foster home.

how she feels about what she did or how it affects other people, she just easily shrugs it off."

Beth was recently admitted to a psychiatric hospital for having homicidal ideations. Hindman recommended that Beth's foster mother take Beth for a psychiatric session after Hindman saw Beth trying to force a four-year-old girl out of a chair by pushing on the chair from underneath a table. Beth told Hindman that she wanted the child "to fall out of the chair and bust her head open"; Hindman said Beth was "very clear" that she intended to kill the child. When Hindman asked Beth whether she had thought about any other ways of killing the child, Beth responded that she would take a knife and slit the child's throat. When Beth could not find a play knife to demonstrate how she would do it, she put a Lincoln Log to Hindman's throat, made "a motion across her throat with her hand," and said that she wanted the child to die. Hindman then asked Beth if she had access to a real knife, and Beth responded that she could find one in a bottom kitchen cabinet.

Beth was hospitalized for about ten days. She was prescribed Risperdal, which Hindman thought was necessary to address the intensity of Beth's behaviors and her mental status. Hindman is concerned with Beth's intense anger, impulsivity, and inability to manage her emotions and keep herself in a stable state. Hindman is similarly concerned with the intensity of Mary's anger. During Hindman's play-therapy sessions with the girls, they indicated that they had witnessed multiple occasions of violence between the parents. These incidents involved lots of yelling,

hitting, and pushing. The girls had also "expressed awareness of [Father]'s suicide attempt"; had "expressed witnessing blood"; and had described an incident in which Mother was trying to get away from Father that involved "[k]icking a window out." The girls also indicated that Henry would intervene in the parents' fights in an attempt to stop them. Hindman explained that a child's exposure to this kind of trauma can negatively impact the child's brain development, emotional control, and behavioral control. The girls will continue to need therapy, possibly on a long-term basis.

After Beth's hospitalization, she returned to the same foster home, and the girls' behavior was the best the CASA had seen from them. Hindman, Villegas, and the CASA had no concerns about the foster home where Beth and Mary have been placed. The girls have bonded with the family. Both girls are doing very well in the home, which is very structured.

Hindman was confident that the parents' actions had negatively affected the children. Hindman acknowledged that although removing children from their parents can traumatize the children, sometimes removal is necessary. From what she had learned while counseling the children here, removal from Mother and Father was necessary.

The Department has not identified adoptive placements for the children.[32] According to both Villegas and Hindman, none of the children are ready or stable

---

[32]None of the foster parents here were adoption motivated. The Department's initial goal was family reunification, but that goal changed to unrelated adoption in

35

enough to be placed in a prospective adoptive home. The children still have many emotional and behavioral problems that need to be addressed. Hindman, Villegas, and the CASA all agreed that given the trauma the children had witnessed and the extent of the parents' issues, returning the children to the parents would not be in the children's best interest.

Villegas explained that the Department was asking for termination of Mother's and Father's parental rights because the children had "seen and witnessed a lot" and were traumatized. According to Villegas, the children "almost can't function at this moment because . . . they keep reliving things."

### D. The parents' progress and the Department's continued concerns

Villegas acknowledged that the parents had made some progress but had addressed the Department's concerns only "to some extent." Villegas explained that a service plan is not just a checklist but is a way for parents to demonstrate changed behavior to the Department. The Department encourages parents to complete their service plan early so that they can demonstrate to the Department that their behavior has changed.

Here, the parents had not addressed the Department's concerns to the point that Villegas would feel comfortable returning the children. Father had not made a lot of progress. Mother had not reduced the risk to herself because even though she had

March 2023 based on the parents' lack of progress on their service plans and the lack of potential family placements.

36

acknowledged that the parents' relationship was bad, she had not left Father. It concerned Villegas that even after all the classes Mother had taken and the progress she had made, Mother still maintained a relationship with Father. Mother told Villegas that even if she did leave Father, she did not "think anything would keep him away." Villegas agreed that because the parents were still together, returning the children to Mother was tantamount to returning the children to both parents.

Hindman and the CASA also acknowledged that the parents had recently improved. The CASA, however, maintained that these recent changes were not enough. Hindman was very concerned about the children's being returned to the parents because Mother and Father continue to have "a lot of issues" that need to be addressed. When Hindman was asked whether the parents' issues could be resolved in a couple of months, she responded, "No," and explained,

> The issues that I'm aware of involve mental health issues, domestic violence issues, and substance abuse issues that have been long-term issues for these parents.
>
> Given the nature of each one of those, it would be more than just a couple of months to be able to stabilize, enter some kind of recovery, and have a solid relapse prevention plan in place. That would take more than just a couple of months.

### E. The jury's findings

As to each child, the jury unanimously found by clear and convincing evidence that each parent had

- knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being;

37

- engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and

- failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who had been in the Department's permanent or temporary managing conservatorship for not less than nine months as the result of the child's removal from the parent under Family Code Chapter 262 due to the child's abuse or neglect.

*See id.* § 161.001(b)(1)(D), (E), (O). The jury further found by clear and convincing evidence that termination of Mother's and Father's parental rights to each child was in that child's best interest. *See id.* § 161.001(b)(2). Based on the jury's findings, the trial court terminated Mother's and Father's parental rights to the children and appointed the Department as the children's permanent managing conservator.

Mother and Father timely filed separate notices of appeal.

### III. Mother's and Father's Points

Mother and Father have filed separate briefs raising similar points. In their first through eighth points, they challenge the legal and factual evidentiary sufficiency to support each of the jury's findings. Mother raises two additional points: (1) the trial court abused its discretion by denying her requested jury charge on Section 161.001(d)'s affirmative defense of whether Mother made a good-faith effort to comply with her court-ordered service plan and whether Mother's noncompliance was her fault (Mother's ninth point) and (2) the trial court abused its discretion by denying Mother's request to extend Section 263.401(b)'s one-year dismissal deadline (Mother's tenth point).

We will address these points out of order because doing so aids in our disposition of the parents' appeals.

## IV. Mother's Motion to Extend the Statutory-Dismissal Date

In her tenth point, Mother contends that the trial court abused its discretion by denying her motion to extend the case's October 2, 2023 statutory-dismissal date.

Generally, the statutory deadline for beginning a termination trial is the Monday following the first anniversary of the day that the trial court appointed the Department as the child's temporary managing conservator. *See id.* § 263.401(a). If, however, a trial on the merits has not commenced within that time, the trial court may extend the dismissal deadline if the movant shows "that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). "The focus is on the needs of the child, whether extraordinary circumstances necessitate the child remaining in the temporary custody of the Department, and whether continuing such is in the best interest of the child." *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc) (op. on reh'g) (citing Tex. Fam. Code Ann. § 263.401(b)). "The statute's clear preference is to complete the process within the one-year period." *Id.* at 605. Actions that are "considered to be the parent's fault" will generally not constitute an extraordinary circumstance. *In re O.R.F.*, 417 S.W.3d 24,

42 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re G.P.*, No. 10-13-00062-CV, 2013 WL 2639243, at *1 (Tex. App.—Waco June 6, 2013, no pet.) (mem. op.)).

We review a trial court's decision to grant or deny a dismissal-date extension for an abuse of discretion. *A.J.M.*, 375 S.W.3d at 604. A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

The trial court heard Mother's extension motion the week before the September 11, 2023 trial. In her motion, Mother asked the trial court to extend the dismissal date to give her more time to complete her service plan. Her request was primarily based on her inability to attend in-person counseling—which the trial court had ordered Mother to do in June 2023—because only Zoom sessions were available. At the hearing, Mother testified that she had been participating in Zoom individual counseling through Merit Family Services but that no in-person sessions were offered. According to Mother, the Department had not provided any options for in-person counseling, and she did not think that she was on a waiting list for in-person counseling with Merit Family Services.

Mother also testified that she had completed her parenting and anger-management classes and had completed her psychosocial assessment in July 2023. Mother was one class away from completing her VIPP and was attending substance-abuse and couples counseling. She had not, however, completed her psychological assessment, which was scheduled for September 13, 2023, or if the case went to trial, October 11, 2023. Mother had a part-time job, had applied for a certification at Weatherford College, and had joined and was involved in a church.

Mother explained that she had delayed working her service plan because she and Father were traumatized by the children's removal. She was also without an attorney for several months but admitted that even without counsel, she understood what services she was required to complete. Mother also admitted to being behind on lot rent; refusing to take the medication prescribed to treat her depression, anxiety, and insomnia; and refusing to drug test for several months into the case because Father had persuaded her not to test because the couple was using marijuana.

Hindman testified about the effect of extending the case on the children. She explained that in a child's mind, a six-month timeframe feels like years, and children who have answers do better than children who are waiting. She further explained that a six-month extension would be difficult for any child to conceptualize because "[i]t feels like a very long time," which can create anxiety and confusion. Anxiety and confusion commonly cause increased behavior problems. She opined that six months was going to be very difficult for the girls to navigate.

41

Mother argues that "while [she] was at fault for some of the delays in working her plan at the beginning of the case, she was fully committed at the time of the hearing and making a good[-]faith effort to complete her service plan." As noted, actions that are "considered to be the parent's fault" will generally not constitute an extraordinary circumstance. *O.R.F.*, 417 S.W.3d at 42. Even though Mother was unable to complete in-person counseling, Mother had delayed working her service plan for several months after the children were removed and was still not finished with several other parts of her service plan the week before trial. Additionally, Hindman testified that delaying the trial another six months could have a detrimental effect on the children, specifically Beth and Mary. We conclude that in focusing on the needs of the children, the trial court could have reasonably concluded that Mother had failed to prove that extraordinary circumstances justified an extension and that an extension would have been in the children's best interest. *See* Tex. Fam. Code Ann. § 263.401(b). We thus hold that the trial court did not abuse its discretion by denying Mother's motion to extend the dismissal date.

We overrule Mother's tenth point.

### V. Evidence Supporting Termination of Mother's and Father's Parental Rights

In their first through eighth points, Mother and Father challenge the legal and factual sufficiency of the evidence supporting each of the jury's findings.

42

## A. Burden of proof and standard of review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The

factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved a predicate ground listed in Family Code Section 161.001(b)(1) and that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Clear and convincing evidence of one pleaded conduct ground is sufficient to support a termination decision if coupled with sufficient best-interest evidence. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.). But if one of the pleaded and found conduct grounds is based on endangerment—Section 161.001(b)(1)(D) or (E)—then we must fully address that ground, if presented on appeal, based on the future collateral consequences of such a finding. *See In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing termination of parent's

44

parental rights if such rights to another child had been terminated under Section 161.001(b)(1)(D) or (E)). We therefore first address the sufficiency of the evidence supporting the jury's findings on each of these grounds.

## B. The jury's endangerment findings

Mother and Father argue in their first through fourth points that the evidence is legally and factually insufficient to support the jury's findings that they endangered their children's physical and emotional well-being under Sections 161.001(b)(1)(D) and (E) of the Family Code.

Subsections (D) and (E) provide that a trial court may terminate a parent's parental rights if a factfinder finds by clear and convincing evidence that a parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

The difference between Subsections (D) and (E) is the source of the physical or emotional endangerment to the child. *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *3 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). Endangerment—which is defined as exposing the child to loss or injury or to jeopardy—under Subsection (D) arises from the child's environment, while endangerment under Subsection (E) must be a direct result of a parent's conduct,

45

including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). But a parent's conduct can also contribute to an endangering environment under Subsection (D) because "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* (first citing *In re W.S.*, 899 S.W.2d 772, 776–77 (Tex. App.—Fort Worth 1995, no writ); and then citing *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.)).

Termination of parental rights under Subsection (E) requires more than a parent's single act or omission; rather, it requires a voluntary, deliberate, and conscious course of conduct by the parent that endangers the child, even though the conduct need not be directed at the child and the child need not actually suffer injury. *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *13 (Tex. App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.) (citing *J.T.G.*, 121 S.W.3d at 125); *see also In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder was not required to ignore a long history of dependency and destructive behavior, including abusing drugs and alcohol, in considering endangerment). Furthermore, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *L.M.F.*, 2014 WL 2465137, at *14; *R.W.*, 129 S.W.3d at 739. Mental illness or mental incompetence alone is not a basis for terminating the parent–child relationship, but

when a parent's mental state allows him to engage in conduct that endangers the child's physical or emotional well-being, "that conduct has a bearing on the advisability of terminating the parent's rights." *L.M.F.*, 2014 WL 2465137, at *14 (quoting *Maxwell v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.)). "A parent's attempt to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being." *J.T.G.*, 121 S.W.3d at 126. Domestic violence and a propensity for violence may also be considered as evidence of endangerment. *L.M.F.*, 2014 WL 2465137, at *14 (citing *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we will conduct a consolidated review. *See In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *21 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.); *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.).

Here, as set out more fully above, Father had a history of self-harm and suicide attempts, and during an argument in May 2022, Father picked Mother up by her throat and slammed her down. Father then hit the back of his head with a hammer and slammed his head into a wall. This incident happened while the children were in the home, and Henry witnessed it. Mother and Father maintain that the May

47

2022 incident was the only domestic-violence incident between the parents. But Beth and Mary told Hindman that they had witnessed multiple violent incidents between the parents. The girls were also aware of Father's suicide attempts. All three children exhibited mental-health issues and severe behavioral problems primarily caused by their exposure to violence in the home.

Mother claimed that at the time of these incidents, she did not fully understand how the parents' behavior had endangered the children. But the jury could have reasonably disbelieved that testimony. Mother testified that she took the children and left Father after each incident. She told Seyfried after the May 2022 incident that Father's behavior was becoming more erratic and had increased to a level that made her "very fearful for her safety and the safety of her children." She was concerned that he would commit suicide in front of the children or "take a turn and take his violence out on the kids." Mother also told Seyfried that based on the parents' relationship and where it was going, she believed that if she stayed with him, he would eventually kill her. But despite Father's behavior and Mother's concerns for her safety and that of the children, she had continued to reunite with Father. From this evidence, the jury could have reasonably inferred that Mother knew that the parents' conduct created an endangering environment for the children.

As both parents point out, there have been no recent self-harm incidents and both parents were participating in various forms of counseling and were showing signs of improvement. And Mother maintained that she would leave Father for good

if he engaged in self-destructive behavior again. But even if a parent makes dramatic improvements before trial, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." *In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *3 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (per curiam) (mem. op.) (quoting *J.O.A.*, 283 S.W.3d at 346). Here, both parents had ongoing mental-health issues and had resisted treatment. Merrill testified that Mother and Father have a very enmeshed relationship, which casts doubt on whether Mother would, in fact, separate from Father to keep the children safe. Mother acknowledged that her relationship with Father was troubled, but she had not left him. And Wernert maintained that it was not safe to return the children to Mother if Father was still in the home.

Applying the applicable standards of review, we conclude that the evidence here is legally and factually sufficient for the jury to have formed a firm belief or conviction that Mother and Father had knowingly placed or knowingly allowed all three children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See In re S.G.*, No. 02-14-00245-CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no pet.) (per curiam) (mem. op.) (stating that "abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being"). The jury could likewise have formed a firm belief or conviction that Mother and Father had engaged in conduct that endangered the children. *See J.T.G.*, 121 S.W.3d at 126 (explaining that a parent's

49

suicide attempts may "contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being"); *see also In re C.A.G.*, No. 14-18-00930-CV, 2019 WL 1523114, *8–9 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (explaining that mother's refusal to leave father, whose behavior had endangered the child's physical and emotional well-being, demonstrated a course of conduct by mother that endangered the child's physical and emotional well-being); *In re E.G.*, No. 02-14-00351-CV, 2015 WL 1262631, at *9 (Tex. App.—Fort Worth Mar. 19, 2015, no pet.) (per curiam) (mem. op.) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being."). Having concluded that the evidence is legally and factually sufficient to support the jury's findings under Subsections (D) and (E), we overrule Mother's and Father's first, second, third, and fourth points.[33]

## C. The jury's best-interest findings

The parents' seventh and eight points challenge the legal and factual sufficiency of the evidence supporting the jury's findings that termination of the parents' parental rights was in the children's best interest.

---

[33]Because the evidence is legally and factually sufficient to support the jury's Subsection (D) and (E) findings, we need not address Mother's and Father's fifth and sixth points, which challenge the sufficiency of the evidence to support the jury's Subsection (O) findings (failure to complete their service plans). *See* Tex. R. App. P. 47.1; *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *15 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). We also need not address Mother's ninth point, which challenges the trial court's failing to instruct the jury on Section 161.001(d)'s affirmative defense to termination under Subsection (O). *See* Tex. R. App. P. 47.1.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

*As to the children's desires*, the children love their parents, and they asked the parents during visitation whether the parents had started their service plans so that the children could go home. This factor weighs against terminating the parents' parental rights to the children.

*Regarding (1) the children's physical and emotional needs now and in the future, (2) the physical and emotional danger to the children now and in the future, and (3) the programs available to assist the parents in promoting the children's best interests*, the children have emotional and behavioral problems that are the product of what they had witnessed in the home. Henry and Beth required hospitalization and medication, and Henry was in an RTC at the time of trial because he was not stable enough to return to a foster home. Villegas opined that Henry was in danger of harming himself or others if he was not in an RTC. All three children required continued counseling and therapy, and Hindman was

52

not in favor of the children returning home because both the children and the parents still have issues to address.

The parents agreed that the children needed counseling and therapy and stated that they would continue to take the children to treatment if the children were returned to them. The parents were still working on their service plans and had a support network through their church family. Both parents said that they were willing to continue their treatment and counseling.

But the parents were unwilling to take any psychotropic medications prescribed to them, and they would hesitate to allow the children to take them. The parents had also resisted inpatient mental-health treatment when it was recommended to them. And, until recently, they had largely resisted engaging in the requisite assessments, classes, and counseling. According to Merrill and Hindman, both parents had a long way to go in dealing with their issues. And Father's level of resistance to substance-abuse counseling caused Merrill concern for both parents' continued recovery. From this evidence, the jury could have reasonably inferred that the parents would not continue to seek the treatment and counseling that they and the children required.

Wernert testified that it was too soon for him to say whether Father was a continued domestic-violence risk and that it was not safe to return the children to Mother if Father was still in the home. Mother had not separated from Father, and although she maintained that she would leave Father if he engaged in violent behavior again, the jury could have reasonably inferred from Mother's past actions, her

statements regarding divorce, and the parents' enmeshed relationship, that it was unlikely that she would do so. It was thus reasonable for the jury to conclude that Father remained a danger to the children and that Mother was unwilling to leave Father for the children's well-being.

Although the parents had completed some of their service-plan requirements, had recently shown a willingness to work their plans, and had demonstrated some improvement, we conclude that based on the parents' past conduct, the jury was entitled to conclude that these factors weighed in favor of terminating Mother's and Father's parental rights. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("[I]t is proper to measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest."); *In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that a parent's "recent turnaround" and compliance with a service plan are factors jurors should consider in a determination of best interest but are not determinative); *see also In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.) (holding termination in child's best interest despite mother's lifestyle improvements and eventual compliance with service plan).

*As to the parents' parenting abilities*, the parents completed their parenting classes relatively early in the case. But they failed to exhibit good parenting abilities during their visitations, and their visitation rights were suspended because of their behavior during the February 21, 2023 visit. The parents were unable persuade the trial court to

54

reinstate their visitation rights so that they could demonstrate their parenting abilities during their visits.[34] We conclude that this factor weighs in favor of terminating the parents' parental rights.

*As to the parents' and the Department's plans for the children*, the parents, as noted, planned to continue the children's counseling and therapy. But again, the jury could have reasonably disbelieved their testimony. Mother testified that she planned to work while the children were in school and to be home whenever they were home. She also planned to enroll Henry and Beth in a local elementary school. That elementary school also has a preschool that she planned to enroll Mary in, but if no space was available for Mary, Mother knew of a nearby Christian school that would accept her.

The Department's plan for the children was unrelated adoption. But at the time of trial, none of children were ready or stable enough to be placed in a prospective adoptive home. The children still had significant emotional and behavioral problems that needed to be addressed and stabilized. And the Department was continuing to provide counseling and treatment. We conclude that this factor weighs in favor of terminating the parents' parental rights.

*Regarding the stability of the parents' home*, the parents owned their mobile home, but were $1,400 behind on lot rent. Mother testified that the family was not in danger of losing their home because they had worked out a payment plan with the lot owner.

---

[34]The parents have not challenged the trial court's rulings on their motions to reinstate visitation.

Father also said that they were not in danger of losing their home. Both parents maintained that their financial troubles were attributable to their inability to work full time due to the time it took to work services. Mother and Father anticipated that Father would be able to work full time after he finished his services and would thus be able to provide for the family. A jury could have reasonably concluded that this factor weighs against terminating Mother's and Father's parental rights.

*As to (1) the parents' acts or omissions indicating that the existing parent–child relationship is not a proper one and (2) any excuse for the parents' acts or omissions*, Mother and Father both acknowledged the reasons for the children's removal and accepted responsibility for the violence that the children had witnessed in the home. They each admitted that Father's self-harm and the domestic violence between them had created an environment that endangered the children's physical and emotional well-being and that the conduct itself had endangered the children's physical and emotional well-being. They also admitted to illegal drug use during the case, refusing to test, and testing positive for illegal drugs.

Again, the parents had recently shown progress and had made positive changes. But Mother continued to fail to recognize the dangers of staying with Father. Villegas was concerned that even after all the classes Mother had taken and the progress she had made, she still maintained a relationship with Father. And although Mother insisted that she would leave Father to get her children back, she had not done so. Moreover, Merrill testified that Father still had issues with taking accountability for his

actions and was still blaming others—specifically the Department, OCOK, and Mother—for his problems. We conclude that these factors also weigh in favor of terminating Mother's and Father's parental rights to the children.

Most of the *Holley* factors weigh in favor of terminating the parents' rights to their three children. Applying the applicable standards of review, we hold that the evidence here is legally and factually sufficient for the jury to have formed a firm belief or conviction that terminating Mother's and Father's parental rights to Henry, Beth, and Mary was in the children's best interest. Having held that the evidence is legally and factually sufficient to support the jury's best-interest findings, we overrule Mother's and Father's seventh and eighth points.

## VI. Conclusion

Having overruled all points necessary to our disposition of this appeal, we affirm the trial court's judgment terminating Mother's and Father's parental rights to Henry, Beth, and Mary.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: March 21, 2024